**GREENBERG TRAURIG, LLP**
Thomas P. O'Brien (SBN 166369)
*Thomas.OBrien@gtlaw.com*
Dominic E. Draye (SBN 267079) (*admission pending*)
*DrayeD@gtlaw.com*
Nathan J. Montalto (SBN 369083) (*admission pending*)
*Nate.Montalto@gtlaw.com*
Jacqueline E. Massian (SBN 357503) (*admission pending*)
*Jacqueline.Massian@gtlaw.com*
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

Attorneys for Plaintiff
THE GEO GROUP, INC.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE GEO GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>Defendant. | CASE NO.<br><br>**COMPLAINT** |

For its Complaint against Defendant Rob Bonta, Plaintiff The GEO Group, Inc., by counsel, states as follows:

**NATURE OF THIS ACTION**

1. Plaintiff The GEO Group, Inc. ("GEO") brings this action for declaratory and injunctive relief against Defendant Rob Bonta, in his official capacity as Attorney General of the State of California, regarding California Senate Bill 942 ("S.B. 942"), the Civil Detainees' Bill of Rights Act of 2026.

2. This is the latest in a string of cases involving California's attempts to ban or regulate federal immigration enforcement. In 2019, California enacted A.B. 32, which purported to outlaw any "private detention facility within the state." In *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 758–63 (9th Cir. 2022) (en banc), GEO and the United States challenged A.B. 32 under the Supremacy Clause on intergovernmental-immunity and preemption grounds. The Ninth Circuit, sitting en banc, held that A.B. 32 was invalid as applied to ICE-contracted facilities on two independent Supremacy Clause grounds: direct regulation under intergovernmental immunity and obstacle preemption. *Id.* at 758–63. As the court explained, "either doctrine would lead to the same result," *id.* at 758, and held that A.B. 32 was preempted because it would override the Federal Government's congressionally authorized decision to use private contractors to operate immigration-detention facilities, *id.* at 762–63. The court declined only to reach whether A.B. 32 was generally applicable or whether it discriminated against the Federal Government and its contractors. *Id.* at 758 n.7.

3. Similarly, California enacted several statutes (A.B. 103, S.B. 54, A.B. 450) aimed at "protecting immigrants from an expected increase in federal immigration enforcement actions." The Ninth Circuit struck down portions of A.B. 103 as unlawful under the doctrine of intergovernmental immunity, but upheld limited provisions of A.B. 103 that allowed the California Attorney General to enter ICE immigration detention facilities to conduct "reviews" of the conditions of confinement and the standard of care. *United States v. California*, 921 F.3d 865 (9th Cir. 2019). Notably, in defense of those narrow provisions, California correctly argued at the Ninth

Circuit that A.B. 103 does not impose standards on the conditions of facilities, nor does it mandate any policies and procedures. California's argument therefore concluded that there is no conflict with the national detention standards promulgated by ICE, and that A.B. 103 includes no enforcement mechanism. In reaching its decision, the Ninth Circuit specifically highlighted that A.B. 103 did not regulate confinement or impose mandates on the ICE contractors but merely required access for inspections and the production of data. *Id.* at 885. The court also rejected the preemption challenge to A.B. 103 because "[t]he United States ***d[id] not dispute***" that federal law did not evince a congressional intent to supersede state regulations. *Id.* at 886 (emphasis added).

4. But S.B. 942 goes far beyond the limited review regime upheld in *United States v. California*. Unlike A.B. 103, S.B. 942 imposes California substantive rights and operational standards on facilities housing civil immigration detainees, requires facility operators to observe and protect those rights, authorizes Attorney General enforcement and civil penalties, and compels access to detainees, facilities, officials, personnel, and records.

5. The Supremacy Clause is politically agnostic. California may disagree with federal immigration policy and may adopt different policies for facilities it owns, operates, or controls. But it may not impose its preferred immigration-detention standards on federal detention operations, whether those standards would tighten, loosen, supplement, or otherwise alter the federal framework. *See Arizona v. United States*, 567 U.S. 387, 399–402 (2012); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

6. S.B. 942 is not a neutral law that merely increases the cost of doing business with the Federal Government. It changes the way federal immigration detention operations must function by replacing or supplementing federal detention standards with California standards and by subjecting federal operations to California enforcement, civil penalties, and compelled access. *See GEO Grp.*, 50 F.4th at 755–56; *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839–40 (9th Cir. 2014).

7. States cannot defeat the Supremacy Clause by targeting federal contractors rather than naming the federal government directly. Courts look through form and labels to substance,

because "what cannot be done directly cannot be done indirectly." *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 322–24 (3d Cir. 2025) (internal quotation marks omitted). S.B. 942 should therefore be assessed for what it is: a state-law effort to dictate the manner in which federal immigration detention is carried out through ICE's contractors. No one else is even "in the business" of immigration detention.

8. The Supremacy Clause protects federal functions, not merely federal employees. The Federal Government does not surrender control over distinctly federal immigration detention operations, or accept state micromanagement of those operations, simply because it determines that the optimal means of carrying out those federal functions is through private contractors rather than federal employees. *See United States v. Virginia*, 139 F.3d 984, 989–90 (4th Cir. 1998); *CoreCivic*, 145 F.4th at 322–25; *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988); *United States v. Town of Windsor*, 765 F.2d 16, 19 (2d Cir. 1985).

9. *Watson v. Philip Morris USA, Inc.*, 551 U.S. 142, 151–54 (2007), distinguishes ordinary regulatory compliance from private conduct that assists federal officers in carrying out federal duties. GEO's role is the latter: it performs detention services for ICE pursuant to federal contracts that incorporate hundreds of pages of federal regulations, and federal law protects a federal forum and federal defenses for contractors performing work under federal direction. *See* 28 U.S.C. § 1442(a)(1); *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505–09 (1988); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940).

10. DHS acquisition regulations authorize the ICE Head of the Contracting Activity to "enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services." 48 C.F.R. § 3017.204-90. Federal acquisition regulations further provide that contracting officers may "enter into, administer, or terminate contracts and make related determinations and findings," and may bind the Government within the limits of their delegated authority. 48 C.F.R. § 1.602-1(a).

11. The federal immigration detention system depends on flexibility. Contractors allow ICE to respond to changes in detention demand, geography, removal logistics, and court

proceedings without forcing the Federal Government to construct, acquire, staff, and operate permanent federal facilities in every location where detention needs arise. *See CoreCivic*, 145 F.4th at 319–20; *GEO Grp.*, 50 F.4th at 750–52.

12. In response to the congressional mandate to identify "appropriate" facilities, 8 U.S.C. § 1231(g)(1), federal immigration regulations identify qualifying criteria for entities contracted to provide detention services. Chief among those is "compliance with the Standard Statement of Work for Contract Detention Facilities," which incorporates the Performance-Based National Detention Standards ("PBNDS"). *See* 8 C.F.R. § 235.3(e).

13. Congress also created the Office of the Immigration Detention Ombudsman ("OIDO") to establish and administer processes to receive, investigate, resolve, and provide redress for alleged misconduct or violations of rights in immigration detention, and to standardize complaints concerning violations of law, professional-conduct standards, contract terms, or policy related to immigration detention. 6 U.S.C. § 205(b)(1)–(2).

14. S.B. 942 purports to micromanage day-to-day federal immigration detention operations by incorporating California rights and regulatory standards governing communications, confidential calls, mail, attorney correspondence, legal materials, personal property, visitation, treatment-related rights, facility access, and records, and then backing those state-law standards with Attorney General enforcement authority and civil penalties.

15. S.B. 942 goes beyond the limited access-and-review regime addressed by the Ninth Circuit in *California*, 921 F.3d at 882–86, because it incorporates substantive California rights and standards, authorizes state enforcement, permits civil penalties, and requires access to detainees, facilities, officials, personnel, and records.

**JURISDICTION AND VENUE**

16. GEO seeks injunctive relief on its Supremacy Clause claims pursuant to the federal courts' traditional equitable authority to enjoin state officers from enforcing state laws that conflict with federal law. *See Ex parte Young*, 209 U.S. 123, 155–56 (1908); *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326–28 (2015).

17. GEO seeks declaratory relief on all claims pursuant to 28 U.S.C. §§ 2201 and 2202 and seeks relief on its Contracts Clause claim pursuant to 42 U.S.C. § 1983.

18. This Court has jurisdiction under 28 U.S.C. § 1331 because GEO's claims raise federal questions, including whether S.B. 942 violates the Supremacy Clause, is preempted by federal law, and violates the Contracts Clause.

19. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to GEO's claims occurred in this District, and a substantial part of the property that is the subject of this action is situated in this District. The Mesa Verde ICE Processing Center, the Central Valley Annex, and the Golden State Annex are located in this District, and the effects of S.B. 942 will be felt in this District.

## PARTIES

20. Plaintiff GEO is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

21. Defendant Rob Bonta is named in his official capacity as Attorney General of the State of California. He is "the chief law officer of the State" with "the duty…to see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, § 13. S.B. 942 expressly authorizes the Attorney General to bring civil actions, seek injunctive, declaratory, or other equitable relief and civil penalties, and obtain access to detainees, patients, facilities, officials, personnel, and records. In light of these duties, Attorney General Bonta has responsibility for enforcing S.B. 942.

## FACTUAL ALLEGATIONS

### A. S.B. 942 Enactment History and Legislative Record

22. S.B. 942, titled the Civil Detainees' Bill of Rights Act of 2026, would add Section 53.9 to the California Civil Code and Section 12532.1 to the California Government Code. According to the Legislative Counsel's Digest, S.B. 942 purports to clarify that persons housed or detained for purposes of civil immigration proceedings in California at any state, county, local, or private locked detention facility, including any county, local, or private locked detention facility

in which an individual is housed or detained on behalf of, or pursuant to a contract with, the federal Office of Refugee Resettlement or United States Immigration and Customs Enforcement, have legal rights and responsibilities guaranteed by federal and California law unless specifically limited by federal or state law or regulations. S.B. 942, 2025–2026 Reg. Sess., Legislative Counsel's Digest (Cal. Aug. 28, 2026) (as enrolled).

**B. Hearing Testimony Confirmed S.B. 942's Focus on Federal-Contract Immigration Detention Facilities**

23. At the April 15, 2026 Senate Health Committee hearing, Senator Caballero stated that private detention-center operators agree to adhere to ICE-created standards concerning food service, medical care, personal hygiene, religious practices, sleeping conditions, and environmental health and safety. Senator Caballero further stated that no private company operating a civil-confinement facility in California should be exempt from California law, "particularly when under contract to the Federal Government, they've agreed to do so." Frances Davila of the Acacia Center for Justice testified that S.B. 942 would close a gap in California law by establishing meaningful state oversight and ensuring that the State conducts investigations and enforces compliance with required conditions of care and confinement. *Hearing on S.B. 942 Before the S. Standing Comm. on Health*, 2025–2026 Reg. Sess., at 7:09–10:20 (Cal. Apr. 15, 2026), https://calmatters.digitaldemocracy.org/hearings/279151 (statement of Sen. Anna Caballero); *id.* at 10:20–14:10 (statement of Frances Davila, Acacia Center for Justice).

24. At the April 21, 2026 Senate Judiciary Committee hearing, Senator Caballero described S.B. 942 as a bill that would create "state oversight of for profit private detention facilities" to ensure they meet California's standards of care. Supporters likewise testified that although immigration enforcement is the responsibility of the Federal Government, day-to-day operations of these facilities depend on private contractors. *Hearing on S.B. 942 Before the S. Comm. on Judiciary*, 2025–2026 Reg. Sess., at 14:50–17:29 (Cal. Apr. 21, 2026), https://calmatters.digitaldemocracy.org/hearings/279178 (statement of Sen. Anna Caballero); *id.*

at 17:49–19:38 (statement of Hamid Yazdan Panah, Co-Exec. Dir., Immigrant Def. Advocates); *id.* at 19:38–19:50 (statement of Conrad Crump, Disability Rts. Cal.).

25. At the May 26, 2026 Senate floor session, Senator Caballero described S.B. 942 as a bill that would create "state oversight of for profit private immigration detention facilities." Legislators supporting the bill acknowledged that California cannot regulate federal immigration enforcement, but asserted that California could regulate for-profit businesses. *S.B. 942: Senate Floor Session*, 2025–2026 Reg. Sess., at 35:00–37:40 (Cal. May 26, 2026), https://calmatters.digitaldemocracy.org/hearings/279602 (statement of Sen. Anna Caballero); *id.* at 37:40–38:30 (statement of Sen. Steve Padilla); *id.* at 39:00–40:15 (statement of Sen. Susan Rubio); *id.* at 40:30–41:40 (statement of Sen. Sasha Perez).

26. At the June 30, 2026 Assembly hearing, Senator Caballero described S.B. 942 as addressing "over 6,000 people detained in privately run for-profit immigration detention centers within California," who were awaiting civil immigration proceedings and dependent on private for-profit corporations for food, water, shelter, medical care, and religious practices. Senator Caballero further stated that those facilities "operate under federal contracts" and asserted that neither those contracts nor federal oversight reflected her preferred policies. *Hearing on S.B. 942 Before the A. Standing Comm. on Judiciary*, 2025–2026 Reg. Sess., at 0:00–2:50 (Cal. June 30, 2026), https://calmatters.digitaldemocracy.org/hearings/279757 (statement of Sen. Anna Caballero).

27. S.B. 942 declares itself an urgency statute necessary for the immediate preservation of the public peace, health, or safety and provides that it shall take effect immediately to maintain the health and safety of civil detainees in California. S.B. 942, 2025–2026 Reg. Sess. (Cal. Aug. 28, 2026) (as enrolled).

**C. The Enrolled Bill**

28. As enrolled, S.B. 942 would add Section 53.9 to the California Civil Code and Section 12532.1 to the California Government Code. Section 2 declares the Legislature's intent to "reaffirm the existing rights of civil detainees under the Welfare and Institutions Code and Title 9

of the California Code of Regulations," to "extend those rights to similarly situated persons housed or civilly detained at any state, county, local, or private for profit locked detention facility, including individuals housed or civilly detained for purposes of civil immigration proceedings in California," and to "ensure that facility operators observe and protect these rights." S.B. 942 § 2(d).

29. Section 3 would add Civil Code Section 53.9. Subdivision (a) provides that all persons housed or detained for purposes of civil immigration proceedings in California—including persons housed or detained on behalf of, or pursuant to a contract with, the federal Office of Refugee Resettlement or ICE—have the rights and responsibilities guaranteed by the United States and California Constitutions and federal and state law, unless specifically limited by federal or state law or regulations. Subdivision (b) would confer rights governing dignity, privacy, and humane care; mental-health treatment in the least restrictive manner; medical and dental care and treatment; freedom from harm, including abuse or neglect and unnecessary or excessive physical restraint, isolation, or medication; religious practice, physical exercise, and recreation; clean drinking water and functioning toilet and shower facilities; clean facilities and living quarters kept in good repair; and food adequate to maintain health and safely selected, stored, prepared, and served. S.B. 942 § 3 (proposed Cal. Civ. Code § 53.9(a)–(b)(8)). Those subjects are already governed by the Federal Government through the PBNDS and related federal contract requirements.

30. Proposed Section 53.9(b)(9) would also confer, subject to denial for good cause under subdivisions (c) through (e) of Section 884 of Title 9 of the California Code of Regulations, rights to reasonable telephone access for confidential calls, reasonable access to letter-writing materials, and the ability to send and receive correspondence subject to contraband inspection and formal limits on the size, weight, and volume of mail, while prohibiting anyone other than the addressee from reading mail to or from an attorney, court, or government official. S.B. 942 § 3 (proposed Cal. Civ. Code § 53.9(b)(9)). The incorporated portions of Section 884 prescribe the good-cause standard and process for denying and restoring rights, prohibit punitive denial, and

generally limit a denial imposed by a designated professional person to thirty days before further review. Cal. Code Regs. tit. 9, § 884(c)–(e).

31. Proposed Section 53.9(c) would reaffirm that persons protected by Welfare and Institutions Code Sections 4502, 4503, 5325, and 5325.1 and Sections 883 and 884 of Title 9 retain rights to mental-health and dental care and treatment, clean drinking water and functioning toilet and shower facilities, clean facilities and living quarters kept in good repair, and safe and healthful food. S.B. 942 § 3 (proposed Cal. Civ. Code § 53.9(c)). The provisions incorporated by reference regulate the substance of confinement and care, including dignity, privacy, humane care, medical care, and treatment, freedom from harm, restraint, isolation, medication, religious practice, social interaction, exercise, and recreation, personal possessions and storage, personal money, visitors, confidential telephone access, correspondence, packages, legal materials, education, access to advocates, and related matters. Cal. Welf. & Inst. Code §§ 4502, 4503, 5325, 5325.1; Cal. Code Regs. tit. 9, §§ 883, 884.

32. Section 4 would add Government Code Section 12532.1. Subdivision (a) provides that the rights supplied by Civil Code Section 53.9, Welfare and Institutions Code Sections 4502, 4503, 5325, and 5325.1, and Sections 883 and 884 of Title 9 "shall be observed and protected by the operator of any facility in California in which the individuals are housed or civilly detained." S.B. 942 § 4 (proposed Cal. Gov't Code § 12532.1(a)).

33. Proposed Section 12532.1(b)(1) would authorize the Attorney General to bring a civil action in the name of the People of the State of California for injunctive and other appropriate declaratory or equitable relief to protect the incorporated rights and to seek "a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation." Subdivision (b)(2) provides that this authority does not alter the Attorney General's authority to bring a civil action under any other law. S.B. 942 § 4 (proposed Cal. Gov't Code § 12532.1(b)).

34. Proposed Section 12532.1(c) would require that the Attorney General, or the Attorney General's designee, "shall be provided all necessary access for the observations

necessary to ensure compliance," including access to detainees, patients, facilities, officials, personnel, and records. S.B. 942 § 4 (proposed Cal. Gov't Code § 12532.1(c)).

35. Section 5 declares S.B. 942 an urgency statute necessary for the immediate preservation of the public peace, health, or safety and provides that the Act would take effect immediately upon enactment "[i]n order to maintain the health and safety of civil detainees in California." S.B. 942 § 5.

36. S.B. 942 thus would do more than recognize generally applicable protections or authorize limited review of detention conditions. By incorporating the provisions described above, it would impose an extensive body of California statutory and regulatory requirements governing treatment and medical care, restraint, isolation, medication, communications, correspondence, legal materials, personal property, visitation, recreation, and social interaction, food, sanitation, facility maintenance, and related operational matters on federal immigration-detention operations conducted under ICE contracts and federal detention standards. It would then back those state-law requirements with Attorney General enforcement, civil penalties of up to $2,500 for each violation, and compelled access to detainees, facilities, officials, personnel, and records.

37. California already regulates local correctional facilities through Penal Code Sections 6030 and 6031. Cal. Penal Code §§ 6030–31.

38. California separately preserves certain civil rights of state prisoners under Penal Code Section 2601, including rights concerning property, confidential correspondence with attorneys and public officials subject to contraband inspection, access to newspapers, periodicals, and books subject to correctional restrictions, civil actions, marriage, powers of appointment, wills, and certain benefits. Cal. Penal Code § 2601.

39. California also oversees state correctional institutions through the Office of the Inspector General. Penal Code Section 6126 gives the Inspector General responsibilities concerning oversight of internal affairs investigations and the disciplinary process of the Department of Corrections and Rehabilitation, audits and reviews of CDCR policies, practices, and procedures, medical inspections at each state prison, grievance oversight, and monitoring of

use-of-force review processes. Cal. Penal Code § 6126(a)–(i). This oversight structure differs materially from S.B. 942's Attorney General-centered enforcement, civil-penalty, and compelled-access regime.

40. California's existing enforcement scheme for Lanterman-Petris-Short Act patient-rights violations is also materially different from S.B. 942. Under Welfare and Institutions Code Section 5326.9, alleged or suspected violations are investigated by the local director of mental health, the Director of Health Care Services, or the Director of State Hospitals, depending on the setting; if a violation is found, the statute provides for a formal notice of violation, correction periods, referrals to licensing agencies, potential revocation of facility designation, and referrals of violations of law to a local district attorney or the Attorney General. Cal. Welf. & Inst. Code § 5326.9(a)–(c). Certain specified violations may result in civil penalties, including up to $5,000 for intentional physician violations of Sections 5326.2 through 5326.8 and up to $50 per day, not to exceed $1,000, for knowing violations of specified rights under Sections 5325 and 5325.1. *Id.* § 5326.9(d)–(e).

41. California also separately requires private detention facility operators to comply with the detention standards of care and confinement agreed upon in their operating contracts. Cal. Gov't Code § 7320(a). S.B. 942 goes materially further by imposing those additional state-law standards, enforcement mechanisms, penalties, and access obligations on federal immigration detention operations.

42. S.B. 942 does not simply place immigration detainees into California's existing Lanterman-Petris-Short Act enforcement scheme or California's existing correctional oversight structures. Instead, it creates a separate enforcement regime that authorizes the Attorney General to seek civil actions, equitable relief, civil penalties of up to $2,500 per violation, and undefined "necessary access" to detainees, patients, facilities, officials, personnel, and records. Cal. Gov't Code § 12532.1(b)–(c). That different enforcement mechanism imposes distinct and additional burdens on operators of federal immigration detention facilities.

**D. Standing and Ripeness**

43. S.B. 942 creates an immediate and credible threat of enforcement. It declares itself an urgency statute that would take effect immediately upon enactment; it authorizes the California Attorney General to bring civil enforcement actions; it permits civil penalties of up to $2,500 for each alleged violation; and it requires “all necessary access” to detainees, patients, facilities, officials, personnel, and records. GEO therefore need not await the commencement of enforcement proceedings before seeking declaratory and injunctive relief. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988); *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139–41 (9th Cir. 2000) (en banc).

**E. U.S. Immigration and Customs Enforcement Detention Facilities**

44. In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, housed within the Department of Homeland Security.[1] The Bureau began operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement (ICE) in March 2007.

45. Congress has authorized or required the detention of aliens under several different statutes and conditions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 583 U.S. 281, 287–89 (2018).

46. Congress has granted the Secretary of Homeland Security broad authority “to make contracts . . . as may be necessary and proper to carry out [his] responsibilities,” 6 U.S.C. § 112(b)(2), including contracts with private parties. Congress has also granted the Secretary authority to “carr[y] out,” “in [his] reasonable discretion,” the activities of ICE “through any means, including . . . through contracts, grants, or cooperative agreements with non-Federal parties,” except to the extent that such agreements are otherwise precluded by federal law. 28 U.S.C. § 530C(a)(4).

---

[1] U.S. Immigr. & Customs Enf't, *Celebrating the History of ICE*, https://ice.gov/features/history (last visited Sept. 30, 2026)

47. Congress has also directed that "[t]he [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id.* § 1231(g)(2).

48. In 2000, Congress expressly authorized the Secretary to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis," "[n]otwithstanding any other provision of law." 18 U.S.C. § 4013 note "Contracts for Space or Facilities."[2]

49. Finally, to ensure that immigration detention facilities are meeting the standards of care that the federal government requires, Congress adopted 6 U.S.C. § 205 in 2019, which creates the OIDO to process complaints and conduct unannounced inspections of immigration detention facilities.

50. Thus, Congress has granted ICE, the Secretary's designee, broad discretion to arrange appropriate detention facilities and to use private contractors to provide immigration detention services. *See GEO Grp.*, 50 F.4th at 751–52; *California*, 921 F.3d at 873–74, 882 n.7.

51. Pursuant to this authority, ICE "manages and oversees the nation's civil

[2] Although 8 U.S.C. § 1231(g), 28 U.S.C. § 530C(a), and the note accompanying 18 U.S.C. § 4013 all mention the "Attorney General," the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred the immigration-enforcement functions and programs of the Immigration and Naturalization Service (INS) to the Secretary of Homeland Security, see 6 U.S.C. § 202(3); *id.* § 251(2); 8 U.S.C. § 1103(a)(1); provided that the Secretary "shall have all functions relating to the [INS] that any other official could by law exercise in relation to the agency immediately before such transfer," 6 U.S.C. § 551(d)(2); and specified that for those transferred functions "reference in any other Federal law to any . . . officer . . . the functions of which are so transferred shall be deemed to refer to the Secretary," 6 U.S.C. § 557. Therefore, insofar as each of the three provisions listed above relate to the immigration detention-and-removal program, their references to the "Attorney General" shall be deemed to refer to the Secretary. *See, e.g.*, *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 208 n.* (4th Cir. 2019) (explaining that the mention of the Attorney General in 8 U.S.C. § 1231(g) shall be deemed to refer to the Secretary); *cf. Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

immigration detention system."[3]

52. The Federal Government often relies on private immigration-detention contractors because ICE "does not build its own lockups, and it does not operate them alone," but instead contracts with private companies or local governments to help operate immigration detention facilities. *CoreCivic*, 145 F.4th at 319–20. This contracting model provides operational flexibility needed to increase or decrease capacity as immigration-enforcement needs fluctuate. *Id.*

53. At any given time, approximately 80 percent of federal immigration detainees are held in privately owned or operated facilities. *See Oversight of ICE Detention Facilities: Examining ICE Contractors' Response to COVID-19: Hearing Before the Subcomm. on Border Sec., Facilitation, & Operations of the H. Comm. on Homeland Sec.*, 116th Cong. 1 (2020) (statement of Rep. Kathleen M. Rice). The federal government's reliance on contractors therefore reflects a deliberate federal choice about how best to carry out immigration detention functions nationwide.

54. The individuals housed at GEO's California ICE facilities are federal immigration detainees: they are held pursuant to federal authority, in aid of federal immigration proceedings, under federal contracts, and subject to federal detention standards and federal oversight. California may not transform those federal detention operations into state-regulated facilities merely by directing its commands to the contractor that performs the federal work.

55. Immigration detention serves federal objectives that include ensuring appearance at immigration proceedings, effectuating removal, preventing flight, and protecting the community. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Demore v. Kim*, 538 U.S. 510, 518–21 (2003). California's attempt to impose its own detention-rights regime therefore affects federal immigration enforcement.

**F. Federal Detention Standards**

56. In response to Congress's statutory direction that the Secretary arrange "appropriate

[3] U.S. Immigr. & Customs Enf't, *Detention Management*, https://www.ice.gov/detain/detention-management (last visited Sept. 30, 2026).

places of detention," 8 U.S.C. § 1231(g)(1), federal immigration regulations identify qualifying criteria for entities contracted to provide detention services. Chief among those is "compliance with the Standard Statement of Work for Contract Detention Facilities," which incorporates the PBNDS. 8 C.F.R. § 235.3(e); *Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1235 (W.D. Wash. 2020); *Lyon v. U.S. Immigr. & Customs Enf't*, 171 F. Supp. 3d 961, 990 (N.D. Cal. 2016); *D.A. v. United States*, 663 F. Supp. 3d 715, 740 (W.D. Tex. 2023) (finding compliance with PBNDS is a "non-discretionary duty").

57. ICE mandates, *inter alia*, that all its contractors (state and private) providing detention services operate in conformance with the PBNDS.

58. The "Preface" to the PBNDS provides, *inter alia*:

> ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. Detention is an important and necessary part of immigration enforcement. Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law. The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose.

U.S. Immigr. & Customs Enf't, *Performance-Based National Detention Standards 2011*, at i (rev. Dec. 2016) ("PBNDS 2011"), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011.pdf.

59. The PBNDS are approximately 450 pages in length and establish comprehensive federal standards governing the operation of ICE detention facilities. *See id.* Those standards govern many of the same subjects addressed by S.B. 942, including correspondence and other mail, attorney communications, telephone access, visitation, personal property, legal materials and law-library access, grievance procedures, medical and mental-health care, detainee records, staff training, facility inspections and tours, and access to detainees and detention facilities. Through the PBNDS and related federal contract requirements, ICE has established federal standards and

oversight mechanisms for those subjects in federal immigration detention facilities. Several of those subjects are not merely addressed by both regimes; S.B. 942 purports to alter the governing standards or enforcement mechanisms by imposing California rights, California enforcement authority, civil penalties, and Attorney General access rights on matters already governed by federal standards, federal contracts, and federal oversight processes.

60. The PBNDS are designed to tailor immigration detention to its unique federal purpose: securing detainees' presence for immigration proceedings and removal while maintaining appropriate conditions and care. State standards that replace or supplement those federal determinations interfere with ICE's judgment about how to balance safety, security, order, care, activities, justice, and administration in federal detention facilities. *See* PBNDS 2011 Preface; *Zadvydas*, 533 U.S. at 690; *Demore*, 538 U.S. at 518, 531.

61. Congress has required ICE to report on its progress in implementing the 2011 PBNDS, including the 2016 revisions, and on facility compliance with the PBNDS and PREA-related requirements. The Joint Explanatory Statement accompanying the Fiscal Year 2017 Department of Homeland Security Appropriations Act states: "Within 45 days after the enactment of this Act, ICE shall report on its progress in implementing the 2011 Performance-Based National Detention Standards, including the 2016 revisions…." 163 Cong. Rec. H3812 (2017). House Report 114-668 similarly states: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS and requirements related to PREA, including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance." H.R. Rep. No. 114-668, at 35 (2016).

62. Congress created OIDO to address the same types of detention-facility issues S.B. 942 purports to regulate. OIDO's statutory functions include establishing a standardized process for complaints against officers, employees, contractors, subcontractors, and cooperating entities; conducting unannounced inspections of detention facilities holding individuals in federal immigration custody; reviewing concerns or violations of contract terms identified in reviews,

audits, investigations, or detainee interviews; providing assistance for potential misconduct, excessive force, or violations of law or detention standards; and obtaining access to detainees and records. 6 U.S.C. § 205(b), (c). This federal oversight system confirms that Congress and DHS—not individual States acting through their attorneys general—control inspection, complaint, access, and remedial mechanisms for federal immigration detention.

**G. GEO's Contracts With ICE For Detention Services in California**

63. GEO currently provides contracted secure residential immigration services to ICE at several locations in California, including in this District.

64. Pursuant to a publicly-available 2019 contract ("ICE Mesa Verde Contract"), GEO currently provides secure residential immigration services to ICE at the Mesa Verde ICE Processing Center, the Golden State Annex, and the Central Valley Annex.

65. The ICE Mesa Verde Contract provides that all work performed by GEO must comply with, *inter alia*, the PBNDS.

66. The ICE Mesa Verde Contract directs GEO to review the ICE Contract Detention Facility Design Standards and makes ICE approval mandatory before occupancy.

67. The contract specifies that the federal government is responsible for detainee health and welfare.

68. ICE and the Department of Justice maintain an extensive daily presence at and operational oversight of the facilities where GEO provides detention services. In accordance with the requirement of the contract, GEO provides dedicated offices and other facilities occupied by ICE, as well as an immigration court, which falls under the jurisdiction of the Office of the Chief Immigration Judge, a component of the Executive Office for Immigration Review within the Department of Justice. The contract specifies exactly how many federal employees GEO's facilities must accommodate.

69. All records are the property of the federal government, and their release must comply with specific federal protocols.

70. The incorporated PBNDS charges the federal government with control over access

to the secure portions of the facility and includes detailed regulations governing visits by third parties.

71. The PBNDS requires GEO to adopt a grievance procedure that allows detainees to raise issues and obtain a timely response, free of reprisal. *U.S. Immigration & Customs Enforcement, Performance-Based National Detention Standards 2011*, § 6.2 (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r.pdf. In cases of medical grievances, GEO must respond within 24 hours. *Id.* The PBNDS devotes seven pages to establishing the grievance procedure to be provided at every contract facility, including those operating in this District.

72. In addition to the detailed mandatory federal grievance requirements in the PBNDS, in 2019 Congress created a specific mechanism for oversight and enforcement of the "sound conditions and care" required by the national detention standards when it created the Office of the Immigration Detention Ombudsman to, *inter alia*, investigate complaints and conduct investigations of any alleged violations of the federal "detention standards." 6 U.S.C. § 205(b)(5).

## COUNT I: VIOLATION OF INTERGOVERNMENTAL IMMUNITY (DIRECT REGULATION)

73. Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

74. GEO may invoke intergovernmental immunity where state law controls, interferes with, or imposes direct burdens on the federal operations GEO performs for the United States. Under the Supremacy Clause, "the activities of the Federal government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). A state law offends that principle when it works "a direct, physical interference with federal activities . . . or some direct, immediate burden on the performance of the [federal] functions." *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945). And where state regulation of a contractor would control federal operations, "[e]nforcement of the substance of [the regulation] against the contractors would have the same

effect as direct enforcement against the Government." *GEO Grp.*, 50 F.4th at 760; *see Goodyear Atomic*, 486 U.S. at 180–81; *Boeing*, 768 F.3d at 839–40; *CoreCivic*, 145 F.4th at 321–29.

75. State permit, licensing, approval, or operational requirements cannot be imposed where they interrupt or condition the Federal Government's chosen means of performing federal functions. *See Johnson v. Maryland*, 254 U.S. 51, 57 (1920); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (per curiam); *Pub. Utils. Comm'n v. United States*, 355 U.S. 534, 543–46 (1958); *Hancock v. Train*, 426 U.S. 167, 179 (1976).

76. By prescribing and enforcing substantive California rights and operational requirements governing telephone access, correspondence, attorney communications, legal reference materials, patient and detainee records, facility access, medical and mental-health care, personal property, visitation, recreation, and related conditions of confinement, S.B. 942 substantially interferes with federal operations and places immediate burdens on the performance of federal functions. Federal detention standards already govern those same subjects.

77. S.B. 942 does not merely authorize California officials to observe or review conditions. It imposes California substantive standards on federal immigration detention operations and enforces them through state civil actions, civil penalties, and compelled access to federal detention operations and records—distinguishing S.B. 942 from the limited access-and-review regime addressed in the Ninth Circuit's decision in *California*, 921 F.3d at 882–86.

78. That ICE has chosen to enlist GEO rather than perform every detention function through federal employees is irrelevant to the Supremacy Clause analysis. The detainees are federal detainees, held pursuant to federal authority, in aid of federal immigration proceedings, under a federal contract, and subject to federal detention standards. When California dictates the manner in which GEO performs services for the federal government, it regulates federal immigration detention operations.

79. S.B. 942 thus has the same practical effect as a direct command to ICE, because enforcement of those state-law standards against GEO would control the federal detention operations GEO performs for ICE. *See CoreCivic*, 145 F.4th at 325–28 (state law directly regulated

the Federal Government where it prevented the Government from choosing how and through whom to carry out a core federal immigration-detention function); *GEO Grp.*, 50 F.4th at 760.

80. S.B. 942 is unconstitutional and invalid as applied to GEO's operation of federal immigration detention facilities in California on behalf of ICE because it directly regulates the United States' operation of those facilities by claiming authority to dictate the manner in which the federal immigration-detention function is carried out. *See United States v. Washington*, 596 U.S. 832, 838–40 (2022); *Boeing*, 768 F.3d at 839–40; *GEO Grp.*, 50 F.4th at 755–60, 762–63; *CoreCivic*, 145 F.4th at 322–29.

**COUNT II: FEDERAL PREEMPTION**

**(FIELD PREEMPTION)**

81. Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

82. In enacting Section 1231(g)(1), "Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]," and that discretion is "broad." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986); 8 U.S.C. § 1231(g)(1).

83. Congress reinforced that discretion by authorizing the Secretary to carry out immigration-detention responsibilities through contracts, including with private parties: "to make contracts . . . as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2); to act, in his "reasonable discretion," "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties," 28 U.S.C. § 530C(a)(4); and to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis," 18 U.S.C. § 4013 note "Contracts for Space or Facilities."

84. Even more recently, Congress adopted 6 U.S.C. § 205, creating the Office of the Immigration Detention Ombudsman to establish an independent, neutral, and confidential process to receive, investigate, resolve, and provide redress for alleged misconduct or violations of the

rights of individuals in immigration detention; to establish a standardized complaint process involving officers, employees, contractors, subcontractors, or cooperating entities; to conduct unannounced inspections of facilities holding individuals in federal immigration custody; to review concerns or violations of contract terms; and to ensure that the Ombudsman's functions are complementary to existing functions within DHS. That federal oversight mechanism postdates *United States v. California* and confirms that Congress has established an integrated federal process for inspections, complaints, investigations, facility access, and oversight concerning federal immigration detention facilities.

85. Pursuant to statute, federal regulations govern the operation of ICE's private detention facilities, including many of the same subjects addressed by S.B. 942. Congress has required ICE to report on its progress in implementing the 2011 PBNDS, including the 2016 revisions, and on facility compliance with the PBNDS and PREA-related requirements. *See* 163 Cong. Rec. H3812 (2017); H.R. Rep. No. 114-668, at 35 (2016).

86. S.B. 942 intrudes on that federal scheme by creating a parallel state-law inspection, access, complaint, enforcement, and penalty regime for the same federal detention operations. A State may not displace Congress's chosen federal mechanism for addressing rights, complaints, access, and oversight in immigration detention with California's own enforcement regime.

87. The comprehensive framework Congress enacted for the detention and care of aliens pending removal shows that the Federal Government has occupied the field, and where Congress occupies a field, even complementary state regulation is impermissible. *See Arizona*, 567 U.S. at 401 (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 249 (1984)); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003).

88. Field preemption also applies to "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Arizona*, 567 U.S. at 399. That interest is at its zenith in immigration: the detention of aliens implicates the Federal Government's interest in a uniform immigration system and in the conduct of foreign relations, *Hines*, 312 U.S. at 64–

66, 73, because "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations," *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976); *see Arizona*, 567 U.S. at 395. The conditions of confinement of federal immigration detainees are therefore within a field in which the dominant federal interest precludes enforcement of state laws on the same subject.

89. S.B. 942 is unconstitutional and invalid as applied to GEO's provision of detention services in California on behalf of ICE because it is preempted by Congress's occupation of the field of alien detention and care pending removal and by the dominant federal interests in the care, custody, oversight, and uniform treatment of immigration detainees.

**COUNT III: FEDERAL PREEMPTION**

**(CONFLICT/OBSTACLE PREEMPTION)**

90. Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

91. In cases where federal and state law conflict, "federal law prevails and state law is preempted." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). State law is likewise preempted whenever it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Perez v. Campbell*, 402 U.S. 637, 649 (1971) (quoting *Hines*, 312 U.S. at 67); *see also Rust v. Johnson*, 597 F.2d 174, 178, 181 (9th Cir.), *cert. denied*, 444 U.S. 964 (1979).

92. S.B. 942 conflicts with federal immigration detention requirements, ICE detention standards, and GEO's contracts with ICE in numerous respects, including requirements governing facility access, detainee access, access to records, detainee communications, and correspondence, complaint procedures, grievance processes, detention standards, inspections, investigations, oversight mechanisms, and enforcement authority.

93. Congress established a federal framework governing immigration detention, including the placement of detainees, the contracting for detention services, the implementation of detention standards, the investigation of complaints, the inspection of facilities, and the oversight of detention conditions. *See* 8 U.S.C. § 1231(g)(1); 6 U.S.C. §§ 112(b)(2), 205. Through that

framework, Congress entrusted those responsibilities to DHS, ICE, federal detention standards, federal contracts, and federal oversight mechanisms.

94. S.B. 942 constitutes an obstacle to Congress's objectives by creating a parallel state-law regime governing the same federal detention operations. S.B. 942 interferes with the Federal Government's chosen system of detention standards, oversight, enforcement discretion, complaint resolution, and remedial processes. *See Arizona*, 567 U.S. at 402, 406; *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 423–24 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376–77 (2000).

95. Because the federal government already regulates each of the topics covered by S.B. 942 and requires GEO's compliance with the PBNDS, the imposition of different or additional state-law requirements is an obstacle to the methods the government has designed for enforcing its contracts and incorporated regulations. The contract and PBNDS include procedures and sanctions for non-compliance. In the federal government's discretion, not every violation will necessarily result in a sanction. But S.B. 942 usurps that discretion by making every violation subject to civil penalties. Those penalties are themselves above and beyond the federal government's carefully calibrated responses to non-compliance. That is a textbook obstacle to the federal regulations authorized by Congress and duly promulgated by the Department of Homeland Security. *See, e.g.*, *Crosby*, 530 U.S. at 380.

96. Even where a State seeks to advance comparable objectives, a state-law enforcement scheme is preempted when it interferes with federal officials' exercise of discretion or substitutes state policy judgments for those chosen by Congress and federal agencies. *Arizona*, 567 U.S. at 402, 406.

97. Congress's creation of the OIDO further demonstrates Congress's decision to establish a federal mechanism for receiving complaints, conducting investigations, obtaining facility access, reviewing detention conditions, and addressing alleged violations in immigration detention facilities. *See* 6 U.S.C. § 205. S.B. 942 obstructs that federal choice by establishing a separate California system governing the same subjects.

98. If individual States may impose their own detention-access requirements, complaint procedures, oversight mechanisms, detention standards, enforcement regimes, and penalties on federal immigration detention facilities, the result would be a patchwork of state regulation that would undermine the uniform administration of federal immigration detention and interfere with the Federal Government's conduct of immigration policy and foreign relations. *See CoreCivic*, 145 F.4th at 327–28; *Hines*, 312 U.S. at 64–67; *Arizona*, 567 U.S. at 395, 401–02; *Mathews*, 426 U.S. at 81 n.17.

99. S.B. 942 is unconstitutional and invalid as applied to GEO's provision of detention services in California on behalf of ICE because it conflicts with federal law and stands as an obstacle to the accomplishment and execution of Congress's objectives regarding the detention, care, oversight, and administration of aliens pending removal.

**COUNT IV: VIOLATION OF THE CONTRACTS CLAUSE**

100. Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

101. Article I, Section 10 of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10.

102. By imposing requirements and obligations on GEO's performance of federal contracts that are inconsistent with and conflict with GEO's contracts with ICE, including the federal PBNDS incorporated therein, S.B. 942 will force GEO to breach or materially alter its performance under its contracts with ICE and, therefore, S.B. 942 operates to substantially impair that contractual relationship.

103. S.B. 942 undermines GEO's reasonable contractual expectations because GEO agreed to perform detention services under federal contracts requiring compliance with ICE's federal detention standards. California's after-the-fact imposition of different or additional state-law standards, access obligations, enforcement mechanisms, and penalties materially alters the bargain and exposes GEO to liability for following federal directives.

104. It is unreasonable for California to impair the contracts between the Federal

Government and GEO for the housing of federal immigration detainees by imposing California substantive standards, Attorney General access obligations, civil enforcement mechanisms, and penalties on federal detention operations already governed by federal contracts, federal detention standards, federal oversight, federal monitoring, and enforcement mechanisms, and existing California contract-compliance requirements. This is especially true when federal regulations already govern the same topics.

105. GEO seeks relief for this claim under 42 U.S.C. § 1983 as well as injunctive relief pursuant to principles of equity.

## PRAYER FOR RELIEF

WHEREFORE, GEO respectfully requests that this Court enter an order and judgment:

1. Declaring that S.B. 942 violates the Supremacy Clause and the Contracts Clause of the United States Constitution, is preempted by federal law, and is unconstitutional as applied to GEO in its operation of detention facilities for ICE;
2. Preliminarily and permanently enjoining Defendant, as well as his successors, agents, employees, and all those under his supervision, from enforcing, applying, implementing, or otherwise giving effect to S.B. 942, whether prospectively or retroactively, against GEO in its operation of detention facilities for ICE;
3. Awarding attorneys' fees and costs as permitted by law; and
4. Granting such other and further relief as this Court deems just and proper.

DATED: September 30, 2026 GREENBERG TRAURIG, LLP

By: */s/ Thomas P. O'Brien*
Thomas P. O'Brien
Dominic E. Draye
Nathan J. Montalto
Jacqueline E. Massian
Attorneys for Plaintiff
THE GEO GROUP, INC.